IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

METROPOLITAN EDISON COMPANY; and      )
PENNSYLVANIA ELECTRIC COMPANY,        )
                                      )
                Plaintiffs            )
                                      )
        vs.                           )
                                      )
PENNSYLVANIA PUBLIC UTILITY           )
  COMMISSION;                         )
ROBERT F. POWELSON;                   )
JOHN F. COLEMAN, JR.;                 )
PAMELA A. WITMER;                     )    Civil Action
WAYNE E. GARDNER; and                 )    No. 11-cv-04474
JAMES H. CAWLEY in their              )
  official capacities as              )
  Commissioners of the Pennsylvania   )
  Public Utility Commission,          )
                                      )
                Defendants            )
            and                       )
                                      )
OFFICE OF SMALL BUSINESS              )
  ADVOCATE;                           )
MET-ED INDUSTRIAL USERS GROUP;        )
and PENELEC INDUSTRIAL CUSTOMER       )
ALLIANCE,                             )
                                      )
            Intervenor-Defendants     )

                    *       *       *

APPEARANCES:

        GLEN R. STUART, ESQUIRE
        MATTHEW J. SIEMBIEDA, ESQUIRE
        C.M. NAEVE, ESQUIRE
        JOHN N. ESTES, III, ESQUIRE
        JOHN LEE SHEPHERD, JR., ESQUIRE
        BRADLEY A. BINGAMAN, ESQUIRE
        MORGAN E. PARKE, ESQUIRE
             On behalf of Plaintiffs

        ASPASSIA V. STAEVSKA, ESQUIRE
        JAMES P. MELIA, ESQUIRE
        KENNETH R. STARK, ESQUIRE

ROBERT F. YOUNG, ESQUIRE
BOHDAN R. PANKIW, ESQUIRE
        On behalf of Defendants

              *       *       *

## O P I N I O N

JAMES KNOLL GARDNER
United States District Judge

        This matter is before the court on Defendants' Amended

Motion to Dismiss Pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6)("Motion to Dismiss").[1]  For the reasons

expressed below, the Motion to Dismiss is granted.

### INTRODUCTION

        This action for declaratory and equitable relief arose

against the backdrop of the deregulation of the electricity

industry in Pennsylvania and across the country during the

1990's,[2] and involves a dispute stemming from proceedings before

---

[1]        The Motion to Dismiss (Document 50) was filed on December 21,
2012, together with Defendants' Brief in Support of Amended Motion to Dismiss
(Document 50-2)("Defendants' Brief"), and Exhibits A through E, G and H to
the Motion to Dismiss (Documents 50-3 through 50-9, respectively) and Exhibit
F (Documents 51-1 through 51-3).

        On January 9, 2013, Plaintiffs' Answer in Opposition to Defen-
dants' Amended Motion to Dismiss (Document 52)("Answer to Motion") was filed
together with Plaintiff's Brief in Opposition to Defendant's Motion to Dis-
miss (Document 52-1)("Plaintiffs' Brief"), and Exhibits A through C (Docu-
ments 52-3 through 52-5, respectively) to the Answer to Motion.

        On January 16, 2013, Defendants' Reply Brief in Support of
Amended Motion to Dismiss was filed (Document 53)("Defendants' Reply Brief").
On January 23, 2013, Plaintiffs' Sur-Reply Brief in Opposition to Defendants'
Amended Motion to Dismiss was filed (Document 54)(Plaintiffs' Sur-Reply
Brief"), together with Exhibit D (Document 54-1) to the Answer to Motion.

[2]        See Amended Complaint for Declaratory and Injunctive Relief filed
August 29, 2011 (Document 14)("Amended Complaint"), at ¶¶ 23-25.

defendant Pennsylvania Public Utility Commission ("PPUC") and the Commonwealth Court of Pennsylvania in which plaintiff Metropolitan Edison Company and plaintiff Pennsylvania Electric Company (together, "the company plaintiffs"), defendant PPUC and the Commissioner Defendants[3] (together, "the PPUC defendants"), and the intervenor-defendants participated.[4]

In short, the company plaintiffs allege that they sought permission from the PPUC to pass along certain costs (referred to interchangeably by the parties as "line losses", "transmission line losses", "transmission marginal energy losses" and "marginal losses") to their retail electricity ratepayers.  The company plaintiffs further allege that the PPUC defendants, by Opinion and Order issued March 3, 2010[5], denied the company plaintiffs' request.  The company plaintiffs appealed the PPUC March 3, 2010 Opinion and Order to the Commonwealth Court of Pennsylvania.  On June 14, 2011, the

---

[3]      Robert F. Powelson, John F. Coleman, Jr., Pamela A. Witmer, Wayne E. Gardner, and James H. Cawley are each named defendants in this action, but are sued only in their official capacity as Commissioners of the PPUC.  They will be referred to hereinafter as "the Commissioner Defendants".

[4]      See Amended Complaint at ¶¶ 33-50.

[5]      Pennsylvania Public Utility Commission v. Pennsylvania Electric Company and Pennsylvania Public Utility Commission v. Metropolitan Edison Company [consolidated], 210 WL 2911737 (Pa.P.U.C.)(March 3, 2010).

Commonwealth Court of Pennsylvania affirmed the PPUC March 3, 2010 Order denying the company plaintiffs' request.[6]

The essence of this federal action for declaratory and injunctive relief is the company plaintiffs' allegation that the March 3, 2010 Opinion and Order of the PPUC is invalid because it impermissibly traps (and forces the companies to bear) line loss costs charged to the plaintiff companies pursuant to tariffs approved the Federal Energy Regulatory Commission ("FERC"), thereby violating the Supremacy Clause of the United States Constitution and the Federal Power Act of 1935, 16 U.S.C. §§ 791-828c., and more specifically, the federal filed-rate doctrine.[7]

---

[6]     <u>Metropolitan Edison Company v. Pennsylvania Public Utility Commission</u>, 22 A.3d 353 (Pa.Commw. 2011).

[7]     <u>See</u> Amended Complaint at ¶¶ 1, 3, 21, and 56.

        The company plaintiffs also allege that they have a right to recover the costs (including, and especially, federally-approved charges incurred by purchasing federally-regulated interstate electricity trans-mission service) of providing electricity to their customers.  The plaintiff companies further allege that this property interest is protected by the Fourteenth Amendment to the United States Constitution and that the March 3, 2010 PPUC Opinion and Order deprives the company plaintiffs of that right and result in an unconstitutional application of Pennsylvania's Electric Competition Act, 66 Pa.C.S.A. §§ 2801-2812.  <u>See</u> Amended Complaint at pages 19-21 (Counts II and III).

        Nonetheless, the essence of plaintiff's claims in Counts II and III are each premised on the company plaintiffs' position that they have a right, pursuant to the filed-rate doctrine, to recover the line-loss costs which the March 3, 2010 Opinion and Order allegedly trap and prevent plaintiffs from recovering.

<u>**SUMMARY OF DECISION**</u>

In the within motion, the PPUC defendants seek to have the company plaintiffs' claims dismissed based upon claim preclusion, issue preclusion, <u>Burford</u>[8] abstention, and judicial estoppel.

For the reasons expressed below, I grant the Amended Motion to Dismiss based upon issue preclusion.  Specifically, I grant the motion because the claims asserted by the company plaintiffs are premised upon legal arguments which were raised by plaintiffs in the Commonwealth Court of Pennsylvania and rejected in the Commonwealth Court's Opinion entered June 14, 2011, which was not disturbed on appeal by either the Supreme Court of Pennsylvania or the United States Supreme Court.

<u>**JURISDICTION**</u>

Jurisdiction in this case is based upon federal question jurisdiction pursuant to 28 U.S.C. § 1331.

<u>**VENUE**</u>

Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), and (c)(1)-(2), because all defendants are residents of Pennsylvania,[9] and for purposes of venue, defendant PPUC,

---

[8]        <u>Burford v Sun Oil Co.</u>, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

[9]        Amended Complaint at ¶¶ 5-10.

defendant Powelson, and defendant Gardner each reside in this judicial district.[10]

### PROCEDURAL HISTORY

The company plaintiffs initiated this action by filing their Complaint for Declaratory and Injunctive Relief on July 13, 2011.[11]

On July 14, 2011 the company plaintiffs filed a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania, which sought discretionary review of the Commonwealth Court's June 14, 2011 Opinion affirming the PPUC March 3, 2010 Opinion and Order.[12]

On July 27, 2011 the Office of the Small Business Advocate ("OSBA") of the Commonwealth of Pennsylvania filed a motion to intervene as a defendant in the within action.[13]

---

[10]        Amended Complaint at ¶¶ 5-6, and 9.

         Defendant PPUC has offices and conducts business in Philadelphia, Pennsylvania; defendant Robert F. Powelson resides in Kennett Square, Chester County, Pennsylvania; and defendant Wayne E. Gardner resides in Downingtown, Chester County, Pennsylvania.  Philadelphia, Kennett Square, and Downingtown are each located in this judicial district.  Thus, for purposes of venue, defendant PPUC, defendant Powelson, and defendant Gardner reside in this judicial district.

[11]        Document 1.  (Document numbers used in this Opinion refer to Docket Entries in the official docket number 11-cv-04474 in this matter.)

[12]        Motion to Dismiss, Exhibit D (Document 50-6), Petition for Allowance of Appeal of Metropolitan Edison Company and Pennsylvania Electric Company, at page 1.

[13]        Document 3.

On August 4, 2011, the PPUC defendants filed a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6).[14]

On August 29, 2011, the company plaintiffs filed their Amended Complaint for Declaratory and Injunctive Relief.[15]  By Order dated August 30, 2011 and filed August 31, 2011,[16] I dismissed as moot the PPUC defendants' initial motion to dismiss upon the filing of the Amended Complaint.

On September 2, 2011 the Met-Ed Industrial Users Group ("MEIUG") and the Penelec Industrial Customer Alliance ("PICA") filed a motion to intervene as defendants in the within action.[17]

On September 15, 2011 the PPUC defendants filed a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)[18] seeking to dismiss the Amended Complaint.

On February 28, 2012 the Supreme Court of Pennsylvania denied the company plaintiff's petition for allowance of appeal.[19]

---

[14]        Document 5.

[15]        Document 14.

[16]        Document 15.

[17]        Document 16.

[18]        Document 21.

[19]        Motion to Dismiss, Exhibit E (Document 50-7), Per Curiam Order of the Supreme Court of Pennsylvania dated February 28, 2012.

By Order dated March 28, 2012 and filed March 29, 2012, and for the reasons expressed in that Order, I granted the motion to intervene filed by the OSBA and the motion to intervene filed jointly by MEIUG and PICA.[20]

On June 27, 2012 the company plaintiffs filed a Petition for Writ of Certiorari in the Supreme Court of the United States.[21]

By Order dated September 26, 2012 and filed September 27, 2012,[22] for the reasons expressed in that Order, I dismissed the PPUC defendants' then-pending motion to dismiss plaintiff's Amended Complaint without prejudice for the PPUC defendants to re-file the same motion to dismiss, or an amended motion to dismiss, if appropriate, upon denial of plaintiffs' Petition for Writ of Certiorari (if the petition were denied) or upon the disposition of plaintiffs' appeal by the United States Supreme Court (if the petition were granted).

On October 9, 2012, the United States Supreme Court denied the company plaintiffs' petition for writ of certiorari.[23]

---

[20]        Document 41.

[21]        Motion to Dismiss, Exhibit F (Documents 51-1 through 51-3), Petition for a Writ of Certiorari filed by the company plaintiffs in the Supreme Court of the United States on June 27, 2012.

[22]        Document 45.

[23]        Motion to Dismiss, Exhibit G (Document 50-8), Order List for the United States Supreme Court, at page 12.

Pursuant to the scheduling Order dated October 18, 2012 and filed October 19, 2012,[24] which was modified at the parties request by my Order dated October 26, 2012 and filed November 2, 2012,[25] the within Motion to Dismiss was filed on December 21, 2012 together with a brief and exhibits.

On January 9, 2013, the company plaintiffs' Answer to Motion was filed together with a brief and exhibits.

On January 16, 2013, the PPUC defendants filed their reply brief.[26]  On January 23, 2013, the company plaintiffs filed their sur-reply brief and an exhibit.[27]

Oral argument on the within Motion to Dismiss was held before me on May 20, 2013.  At the conclusion of oral argument, I took the matter under advisement.  Hence this Opinion.

<u>**STANDARD OF REVIEW**</u>

A claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  A Rule 12(b)(6) motion requires the court to examine the sufficiency of the complaint.  <u>Conley v. Gibson</u>, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957)(abrogated in other respects by <u>Bell Atlantic Corporation</u>

---

[24]        Document 46.

[25]        Document 48.

[26]        Document 53.

[27]        Documents 54 and 54-1.

v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  Generally, in ruling on a motion to dismiss, the court relies on the complaint, attached exhibits, and matters of public record, including other judicial proceedings.  Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2008).

Except as provided in Federal Rule of Civil Procedure 9, a complaint is sufficient if it complies with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief".  Rule 8(a)(2) does not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.  Twombly, 550 U.S. at 570, 127 S.Ct. at 1974, 167 L.Ed.2d at 949.[28]

In determining whether a complaint is sufficient, the court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief.  Fowler, 578 F.3d at 210 (citing Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)).

---

[28]        The Supreme Court's Opinion in Ashcroft v. Iqbal, 556 U.S. 662, 684, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868, 887 (2009), states clearly that the "facial plausibility" pleading standard set forth in Twombly applies to all civil suits in the federal courts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  This showing of facial plausibility then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and that plaintiff is entitled to relief.

Although "conclusory" or "bare-bones allegations" will not survive a motion to dismiss, <u>Fowler</u>, 578 F.3d at 210, a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. <u>Phillips</u>, 515 F.3d at 231. Nonetheless, to survive a Rule 12(b)(6) motion, the complaint must provide "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." <u>Id.</u> at 234 (quoting <u>Twombly</u>, 550 U.S. at 556, 127 S.Ct. at 1965, 167 L.Ed.2d at 940) (internal quotations omitted).

The court is required to conduct a two-part analysis when considering a Rule 12(b)(6) motion. First, the factual matters averred in the complaint, and any attached exhibits, should be separated from legal conclusions asserted. <u>Fowler</u>, 578 F.3d at 210. Any facts pled must be taken as true, and any legal conclusions asserted may be disregarded. <u>Id.</u> at 210-211.

Second, the court must determine whether those factual matters averred are sufficient to show that the plaintiff has a "plausible claim for relief." <u>Id.</u> at 211 (quoting <u>Iqbal</u>, 556 U.S. at 679, 129 S.Ct. at 1950, 178 L.Ed.2d at 884).

Ultimately, this two-part analysis is "context-specific" and requires the court to draw on "its judicial experience and common sense" to determine if the facts pled in the complaint have "nudged [plaintiff's] claims" over the line

-11-

from "[merely] conceivable [or possible] to plausible." <u>Iqbal</u>, 556 U.S. at 679-680, 129 S.Ct. at 1949-1951, 178 L.Ed.2d at 884-885.

A well-pled complaint may not be dismissed simply because "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." <u>Twombly</u>, 550 U.S. at 556, 127 S.Ct. at 1965, 167 L.Ed.2d at 940-941.

## FACTS

Based upon the factual allegations averred in the company plaintiffs' Amended Complaint, construed in the light most favorable to the plaintiff, which I must accept as true under the applicable standard of review discussed above, and the public record of the parties' and judicial documents pertaining to the underlying state proceedings, the pertinent facts are as follows.

### Parties

Plaintiffs Metropolitan Edison Company ("Met-Ed") and Pennsylvania Electric Company ("Penelec") are Pennsylvania corporations with their principal place of business co-located in Reading, Pennsylvania.  Met-Ed and Penelec are electric

distribution companies which furnish electric service within authorized service areas in the Commonwealth of Pennsylvania.[29]

Defendant Pennsylvania Public Utility Commission is an administrative agency of the Commonwealth of Pennsylvania, with its principal office located in Harrisburg, Pennsylvania.  The PPUC also has an office in Philadelphia, Pennsylvania.[30]  The PPUC is comprised of five appointed members: defendants Robert F. Powelson (Chairman), John F. Coleman (Vice Chairman), Pamela A. Witmer, Wayne E. Gardner, and James H. Cawley.[31]

The PPUC, is, among other things, responsible for regulating the business of Met-Ed and Penelec, including the retail electric rates that they charge to their customers.[32]

## Regional Transmission Organization

The company plaintiffs' electric distribution facilities are interconnected with an interstate electric transmission grid that is operated by a federally-regulated regional transmission organization ("RTO") called PJM Interconnection, L.L.C. ("PJM").[33]

---

[29]        Amended Complaint at ¶ 4.

[30]        Id. at ¶ 5.

[31]        See id. at ¶¶ 6-10.

[32]        Id. at ¶ 4.

[33]        Id.

PJM provides electric transmission service to Met-Ed and Penelec; and, in turn, the company plaintiffs pay PJM to provide that service over the power grid which PJM administers.[34] For its transmission service, PJM charges the company plaintiffs rates that are set forth in PJM's tariff, which is on file with the Federal Energy Regulatory Commission.[35]

The company plaintiffs purchased transmission service from PJM during the period from January 11, 2007 through December 31, 2010, which is at issue here.  Accordingly, PJM charged the company plaintiffs for that service.  Among the items for which PJM charged the company plaintiffs were "marginal transmission line losses".[36]

---

[34]    Amended Complaint at ¶¶ 4, and 13.

As further explained by the Commonwealth Court of Pennsylvania, PJM is a

> regional transmission organization approved by the Federal Energy Regulatory Commission (FERC) charged with ensuring the reliability of the electric utilities transmission system, and coordinating the movement of wholesale electricity in all or parts of 13 states and the District of Columbia, including most of Pennsylvania and New Jersey.

Energy Conservation Council of Pennsylvania v. Public Utility Commission, 25 A.3d 440, 442 (Pa.Commw.Ct. 2011).

[35]    Amended Complaint at ¶ 4.

[36]    Id. at ¶¶ 13-15.

Section 3F of PJM's Open Access Transmission Tariff -- more specifically, subsection 3F.1 -- states that "[t]ransmission losses refer to the loss of energy in the transmission of electricity from generation resources to load, which is dissipated as heat through transformers, transmission lines, and other transmission facilities."  Answer to Motion, Exhibit D, at page 83.

## Restructuring of Electric Market

During the mid-1990s, the FERC began a transformation
of the nation's system for generating and transmitting bulk
electric power in interstate commerce.  A central feature of
this electric market transformation was the separation of the
three key component parts of electric service -- namely,
generation, transmission, and distribution.[37]

### Federal Level

The company plaintiffs include in their Amended
Complaint an excerpt from the Opinion of then-Circuit Judge,
now-Chief Justice, John G. Roberts in Midwest ISO Transmission
Owners v. FERC, 373 F.3d 1361, 1363-1364 (D.C.Cir. 2005), where
the now-Chief Justice describes the history of federal
deregulation of the electric market:

> In the bad old days, utilities were
> vertically integrated monopolies; electricity
> generation, transmission, and distribution for a
> particular geographic area were generally provided by
> and under the control of a single regulated utility.
> Sales of those services were "bundled," meaning
> consumers paid a single price for generation,
> transmission, and distribution.  As the Supreme Court
> observed, with blithe understatement, "[c]ompetition
> among utilities was not prevalent."  New York v. FERC,
> 535 U.S. 1, 5, 122 S.Ct. 1012, 1016, 152 L.Ed.2d 47
> (2002).
>
> In its pathmarking Order No. 888, FERC
> required utilities that owned transmission facilities
> to guarantee all market participants non-discrimi-
> natory access to those facilities.  See Promoting

---

[37]        Amended Complaint at ¶ 23.

*Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, FERC Stats.& Regs. ¶ 31,036, 31,635-36, 76 F.E.R.C. ¶ 61,009 (1996)(Order No. 888).  That is, FERC required all transmission-owning utilities to provide transmission service for electricity generated by others on the same basis that they provided transmission service for the electricity they themselves generated.  To effectuate this introduction of competition, FERC required public utilities to "functionally unbundle" their wholesale generation and transmission services by stating separate rates for each service in a single tariff and offering transmission service under that tariff on an open-access, non-discriminatory basis.  *See New York*, 535 U.S. at 11; *see generally [Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 397 (D.C.Cir. 2004)]*.

        As the next step toward the goal of a more competitive electricity marketplace, Order No. 888 encouraged -- but did not require -- the development of multi-utility regional transmission organizations (RTOs).  The concern was that the segmentation of the transmission grid among different utilities, even if each had functionally unbundled transmission, contributed to inefficiencies that impeded free competition in the market for electric power.  Combining the different segments and placing control of the grid in one entity -- an RTO -- was expected to overcome these inefficiencies and promote competition. Order No. 888 at 31,730-32; *see also Pub. Util. Dist. No. 1 of Snohomish County v. FERC*, 272 F.3d 607, 610-11 (D.C.Cir. 2001).  Better still if the RTO were run by an independent system operator -- an ISO.  As envisioned by FERC, an ISO would assume operational control -- but not ownership -- of the transmission facilities owned by its member utilities, thereby "separat[ing] operation of the transmission grid and access to it from economic interests in generation." Order No. 888 at 31,654; *see also id.* at 31,730-32. The ISO would then provide open access to the regional transmission system to all electricity generators at rates established in "a single, unbundled, grid-wide tariff that applies to all eligible users in a non-discriminatory manner."  <u>Id.</u> at 31,731; *see also Cal. Indep. Sys. Operator Corp.*, [372 F.3d at 397].  FERC

called this type of separation of generation and transmission "operational unbundling," a step beyond "functional unbundling."   Order No. 888 at 31,654.

Midwest ISO, 373 F.3d at 1363-1364 (alterations and omissions in original), quoted in Amended Complaint at ¶ 24.

Interstate electric transmission rates continue to be regulated by FERC on a cost-of-service basis through a FERC-approved regional transmission organization (PJM).[38]

<u>State Level</u>

In addition to the electric market restructuring taking place at the federal level, changes occurred at the state level as well.

On December 3, 1996 the Pennsylvania legislature enacted the Electricity Generation Customer Choice and Competition Act ("Electric Competition Act").[39]  Pennsylvania's Electric Competition Act complemented the FERC's efforts by restructuring the provision of retail electric service within Pennsylvania.

The Electric Competition Act did so by requiring electric utilities to "unbundle" their retail electric rates, or in other words, "to functionally disaggregate [their rates] into separate distribution, transmission and generation components",

---

[38]        Amended Complaint at ¶ 25.

[39]        15 Pa.C.S.A. §§ 7401-7410, and 66 Pa.C.S.A. §§ 2801-2812.

by January 1, 1999.[40]   The Electric Competition Act also sought
to impose separate "caps" on the unbundled components of
electric utilities' rates.[41]

The restructuring mandated by the Electric Competition
Act gave rise to litigation concerning the restructuring plans
proposed by, among others, the company plaintiffs.[42]

The restructuring litigation was resolved by a
comprehensive settlement agreement dated September 23, 1998.  On
October 20, 1998, the PPUC entered a Final Opinion and Order
granting a joint petition for approval and approving the
comprehensive settlement of the restructuring litigation.  Among
the terms of the restructuring settlement were the following:

> 4.   Transmission and Distribution (T&D) Charges
> will be capped for an additional three and one-half
> years.  The Settlement provides that the cap on Met-
> Ed's and Penelec's transmission distribution charges,
> which otherwise would expire on June 30, 2001, will be
> extended through 2004....
>
> 5.   Generation rates will be capped for an
> additional five years.  The Settlement provides that
> caps on Med-Ed's and Penelec's generation rates, which
> otherwise would expire December 31, 2005, will be in

---

[40]         Amended Complaint at ¶ 33.

[41]         Id.

[42]         See Amended Complaint at ¶ 34 which refers to the omnibus
settlement of the comprehensive restructuring case, and at ¶ 35 which refers
to settlement of outstanding litigation; see also Motion to Dismiss, Exhibit
A (Document 50-3), Final Opinion and Order entered on October 20, 1998 by the
PPUC (approving joint petition for comprehensive settlement of restructuring
litigation) in In re: Application of Metropolitan Edison Company for Approval
of Its Restructuring Plan Under Section 2306 of the Public Utility Code,
1998 Pa. PUC LEXIS 242 (October 20, 1998).

place as provided in the [Electric Competition] Act
until December 31, 2010 and are increased by five
percent (5%) during this five year period....

                         *   *   *

    7.   The Companies [(Met-Ed and Penelec)] are to
divest themselves of their generation assets.
Divestiture proceeds offset stranded costs.  The
Companies will apply net proceeds from the divestiture
of its generation assets to offset stranded costs.[43]

Pursuant to the PPUC-approved comprehensive

restructuring settlement, the company plaintiffs agreed that

costs related to transmission charges were subject to a retail

rate freeze through December 31, 2004, while costs related to

generation charges were subject to a retail rate freeze through

December 31, 2010.[44]

### Rate-Increase Request

Following the expiration of the transmission retail

rate cap on December 31, 2004, the company plaintiff filed an

application with the PPUC for approval of Transmission Service

Charge Riders which would permit the company plaintiffs (through

their retail electric rates) to recover the costs of charges

that the company plaintiffs would incur going forward.[45]

---

[43]         Motion to Dismiss, Exhibit A (Document 50-3), Final Opinion and
Order of the PPUC entered October 20, 1998, at page 5.

[44]         Amended Complaint at ¶ 35.

[45]         Id. at ¶ 36.

After litigation before the PPUC, the PPUC approved the company plaintiffs' Transmission Service Charge Riders by a Final Order issued January 11, 2007.[46]   These Transmission Service Charge Riders provided for recovery of transmission charges incurred by the company plaintiffs through an annual updating and reconciliation of revenues and costs imposed under the FERC-approved PJM tariff.[47]   The Transmission Service Charge Riders allow the company plaintiffs to recover their *projected* transmission costs through their retail rates, and the subsequent updating and reconciliation process conforms the amount collected to the company plaintiffs' *actual* transmission costs for the applicable period.[48]

On April 14, 2008 the company plaintiffs each submitted their first annual Transmission Service Charge Rider "reconciliation filing".   The projected transmission costs for the preceding period turned out to be too low; and, as a result, both Met-Ed's and Penelec's filings sought to (a) recover for past under-collection (which occurred because retail rates charged turned out to be insufficient to cover each company's

---

[46]       Amended Complaint at ¶ 36.   The Final Order approving those Transmission Service Charge Riders was affirmed by the Commonwealth Court of Pennsylvania on appeal.   Id. (citing Metropolitan Edison Industrial Users Group v. Pennsylvania Public Utility Commission, 960 A.2d 189, 198 (Pa.Commw. 2008)).

[47]       Id. at ¶ 37.

[48]       Id.

actual transmission costs) and (b) increase retail rates prospectively to recover higher projected transmission costs.[49]

In response to the April 14, 2008 reconciliation filings, and customer complaints concerning those reconciliation filings, the PPUC (1) instituted an investigation into the justness and reasonableness of Met-Ed's proposed Transmission Service Charge and assigned the matter to an Administrative Law Judge, and (2) conditionally-approved Penelec's proposed Transmission Service Charge subject to resolution of certain customer complaints in response to Penelec's first reconciliation filing.[50]

The company plaintiffs' claims in this federal action have their genesis in the proceedings before the PPUC which followed from the company plaintiff's reconciliation filings. One of the items which the company plaintiffs sought to recover in their reconciliation filings and Transmission Service Charges were "marginal transmission line losses".[51]

In the PPUC reconciliation proceedings, MEIUG and PICA (organizations representing Met-Ed's and Penelec's largest energy-consumer customers) took the position that the marginal line loss charges which the company plaintiffs sought to recover

---

[49]    Amended Complaint at ¶¶ 38-39.

[50]    Id. at ¶¶ 40-41.

[51]    Id. at ¶ 42.

through their reconciliation filings (and, thus, through their retail electric rates) were generation-related charges.  The company plaintiffs' took the position that marginal line loss charges are transmission-related charges.[52]

The resolution of this fundamental dispute carried significant financial consequences because -- pursuant to the 1998 comprehensive settlement of the restructuring litigation -- the retail rate freeze on generation charges was still in effect and would not lapse until December 31, 2010.[53]  By contrast, the retail rate freeze on transmission charges had lapsed on December 31, 2004.

Met-Ed, Penelec, MEIUG, PICA, and the OSBA submitted briefing and an evidentiary hearing was held before Admini-strative Law Judge Susan D. Colwell[54] on January 14, 2009.  Administrative Law Judge Robert P. Meehan issued a Recommended Decision dated July 24, 2009 which recommended to the PPUC the conclusion that marginal line losses are transmission costs, not generation costs.[55]

---

[52]     Amended Complaint at ¶ 42.

[53]     Id.

[54]     ALJ Colwell presided over the evidentiary hearing in the absence of Administrative Law Judge Robert P. Meehan who authored the Recommended Decision in the proceedings following the company plaintiffs' reconciliation filings.

[55]     In re Pennsylvania Electric Company's Transmission Service Change, no. M-2008-2036188 (Pa.P.U.C. July 24, 2009)(Meehan, A.L.J.).

MEIUG, PICA, and the OSBA filed exceptions with the PPUC to ALJ Meehan's Recommended Decision.[56]

### PPUC March 3, 2010 Opinion and Order

By Opinion and Order entered March 3, 2010, the PPUC, among other things, granted the exceptions of MEIUG, PICA, and the OSBA and modified ALJ Meehan's Recommended Decision in accordance with the PPUC March 3, 2010 Opinion.[57]

The essence of the PPUC March 3, 2010 Opinion and Order, as it pertains to this federal action, is its conclusion that marginal line losses are generation costs, not transmission costs.[58]

In its March 3, 2010 Opinion, the PPUC rejected the company plaintiffs' argument that marginal line losses are properly categorized as transmission costs because, as the company plaintiffs argued, the marginal line losses occur as electricity travels over the PJM transmission grid. Specifically, the PPUC found that argument "overly simplistic" because "[i]t completely ignores the fact that the marginal line

---

[56]        PPUC March 3, 2010 Opinion and Order, slip op. at page 1.  (See footnote 57, below, for the full citation of this document).

[57]        Pennsylvania Public Utility Commission v. Pennsylvania Electric Company and Pennsylvania Public Utility Commission v. Metropolitan Edison Company [consolidated], 210 WL 2911737 (Pa.P.U.C.)(March 3, 2010).  The slip opinion form of this Opinion and Order is Exhibit B to defendants' Motion to Dismiss which is located in the record of the within case as Document 50-4. Throughout this Opinion I will cite the PPUCs March 3, 2010 Opinion and Order as "slip op. at [page number]".

[58]        See Pennsylvania Public Utility Commission v. Pennsylvania Electric Company, Slip. Op. at 13-18 (Pa.P.U.C. March 3, 2010).

losses are energy" and, the PPUC concluded, the administrative
record "indicates that the price of line losses is related to
generation" in that "[a]s the delivery volume of energy/
generation increases, so too do marginal line losses."  March 3,
2010 PPUC Opinion, slip op. at 13.

> It is the Commission's position that a mere
> change in the way an item is billed by PJM [(in other
> words, the change from average-cost to marginal-cost
> pricing)] bears no relationship to whether an item is
> transmission or generation related. The basis for that
> determination is the nature of the service provided to
> consumers and how such costs have historically been
> charged to consumers....[T]he proper cost allocation
> for retail ratemaking is wholly within the sound
> discretion of state regulators, not FERC or FERC-
> regulated PJM.

March 3, 2010 PPUC Opinion, slip op. at 13-14.

The PPUC similarly rejected the argument that marginal
line losses are costs which must be related to transmission
because marginal line losses are included in PJM's FERC-filed
Open Access Transmission Tariff ("OATT").  The PPUC concluded
that argument was "misplaced" because the OATT also provides for
charges, such as energy capacity purchases, which are clearly
generation-related and which the company plaintiffs have not
sought to recover as transmission-related.  March 3, 2010 PPUC
Opinion, slip op. at 14.  In other words, the PPUC concluded
that a cost is not a transmission cost simply because it is

listed in PJM's Open Access Transmission Tariff because that
transmission tariff also contains non-transmission costs.
March 3, 2010 PPUC Opinion, slip op. at 14.

In further support of the its conclusion that marginal
transmission line losses are properly categorized as a
generation cost, the PPUC noted that distribution line losses
(which represent the cost associated with energy lost as
electricity travels over the distribution lines between a retail
electric supplier -- such as the plaintiff companies -- and a
retail electric consumer -- such as a business or home) have
historically been, and are still, included in generation rates.
March 3, 2010 PPUC Opinion, slip op. at 21.

Ultimately, the PPUC concluded that

it is within the Commission's discretion whether and
how to allocate costs via a [Transmission Service
Charge] Rider or otherwise.  And, we believe it is
unreasonable to suggest that the Commission is
required to rubber stamp recovery of [marginal
transmission line loss] costs simply because they are
imposed by PJM, even when the [plaintiff] Companies
voluntarily (and properly) sought approval of their
recovery from this Commission acting within its
jurisdiction to set just and reasonable retail rates
for jurisdictional transmission and distribution
facilities.

March 3, 2010 PPUC Opinion, slip op. at 17.

The PPUC acknowledged the practical import of its
conclusion, stating that, "as generation-related costs, marginal
losses cannot be recovered until the Companies' generation rate

caps expire at the end of 2010." March 3, 2010 PPUC Opinion, slip op. at 18.

### Commonwealth Court June 14, 2011 Opinion

The company plaintiffs appealed the PPUC March 3, 2010 Opinion and Order to the Commonwealth Court of Pennsylvania. On June 14, 2011, the Commonwealth Court affirmed the PPUC March 3, 2010 Opinion and Order.[59]

In affirming the PPUC March 3, 2010 Opinion and Order, the Commonwealth Court found that there was substantial record evidence supporting the PPUC's factual determination that (a) line losses represent a loss of energy and (b) have historically been treated as a generation cost and (c) were included in retail electric generation rates after restructuring unbundled generation, transmission, and distribution rates (but before PJM switched from average-cost to marginal-cost calculation of line loss costs). See 22 A.3d at 358-362.

The Commonwealth Court further concluded that the PPUC did not commit an error of law in concluding that line losses are generation costs, rather than transmission costs. Id. at 362-364. Specifically, the Commonwealth Court stated:

> The Commission did not err in holding that line losses are not transmission costs pursuant to Section 2803 of the [Electric] Competition Act and [Met-Ed Industrial Users Group v. Pennsylvania Public Utility Commission,

---

[59]     Metropolitan Edison Company v. Pennsylvania Public Utility Commission, 22 A.3d 353 (Pa.Commw. 2011); Amended Complaint at ¶ 50.

> 960 A.2d 189 (Pa.Commw.Ct. 2008)].  The Commission
> interpreted the definition of transmission costs in
> Section 2803 of the [Electric] Competition Act to
> exclude line loss costs because such costs are not
> incurred directly or indirectly to **provide**
> **transmission service.**  Rather, line loss costs
> represent the generation-related costs associated with
> losses of energy as opposed to, for example,
> congestion costs, which represent the higher costs
> associated with **providing reliable transmission**
> **service** during times of peak usage.  Additionally,
> OATT's definition of "transmission line losses" is
> "the loss of energy in the transmission of
> electricity,"... and the Commission, in its
> interpretation of this term, chose to focus on the
> "loss of energy" factor of this definition rather than
> the "transmission" factor, as [the] Companies wanted.

22 A.3d at 363 (emphasis in original)(internal citation

omitted).

In concluding that the PPUC did not commit an error of

law by excluding line losses from the definition of "trans-

mission costs" in section 2803 of the Electric Competition Act,

the Commonwealth Court stated that the interpretation of that

term by the PPUC (the state agency responsible for enforcing the

Electric Competition Act and with expertise in the area of

electric utilities) is "entitled to great deference." Id.

(citing Popowsky v. Pennsylvania Public Utility Commission,

550 Pa. 449, 462, 706 A.2d 1197, 1203 (1997).[60]

The Commonwealth Court also addressed the company

plaintiff's argument that the PPUC March 3, 2010 Opinion and

---

[60]        In Popowsky, the Supreme Court of Pennsylvania noted that the
Commission's interpretation of the Electric Competition Act and its own
regulations are entitled to great deference and should not be reversed unless
clearly erroneous.  Popowsky, 550 Pa. at 462, 706 A.2d at 1203.

Order was preempted by federal law and violated the filed-rate
doctrine.  22 A.3d at 364-365.  The Commonwealth Court rejected
the company plaintiffs' preemption- and filed-rate-doctrine
arguments and concluded that the PPUC March 3, 2010 Opinion and
Order "was not inconsistent with FERC precedent, did not violate
the Filed-rate Doctrine, and did not improperly prevent [the]
Companies from recovering trapped costs."  Id. at 366.

### Further Appeals

The company plaintiff's petitioned the Supreme Court
of Pennsylvania for allowance of appeal from the Commonwealth
Court's June 14, 2011 ruling.  The Supreme Court of Pennsylvania
denied the company plaintiffs' petition on February 28, 2012.
40 A.3d 123 (Pa. 2012).  Following the denial of their petition
by the state supreme court, the company plaintiffs' sought
review from the United States Supreme Court, which denied the
company plaintiffs' petition for writ of certiorari on Octo-
ber 9, 2012.  ___ U.S. ___, 133 S.Ct. 426, 184 L.Ed.2d 289
(2012).

### DISCUSSION

The PPUC defendants seek to dismiss the company
plaintiffs' claims on the following grounds: full faith and
credit, claim preclusion (res judicata), issue preclusion
(collateral estoppel), Burford abstention, and judicial

-28-

estoppel.  The company plaintiffs' contend that none of those grounds warrant dismissal.

### Full Faith and Credit

The PPUC defendants assert the Full Faith and Credit Act as a separate ground for dismissal.[61]

Pursuant to the Full Faith and Credit Act, 28 U.S.C. § 1738, a federal district court must give the same preclusive effect to a state court judgment that the adjudicating state would give.  E.g., McLaughlin v. Fisher, 277 Fed.Appx. 207, 214 (3d Cir. 2008); Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir. 1988).  Federal courts also give preclusive effect to decisions of state administrative agencies that have been reviewed by state courts.  McLaughlin, 277 Fed.Appx. at 214; Edmundson v. Borough of Kennett Square, 4 F.3d 186, 189 (3d Cir. 1993).

Rather than providing an independent ground for dismissal, the Full Faith and Credit Act requires this court to apply Pennsylvania's claim- and issue-preclusion rules in evaluating the PPUC defendants' claim- and issue-preclusion arguments in support of their Amended Motion to Dismiss. Accordingly, I will apply Pennsylvania's claim- and issue-preclusion law concerning the within motion.

---

[61]     See Defendants' Brief at pages 25-27.

-29-

### Issue Preclusion

Issue preclusion, also known as collateral estoppel, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination." Nationwide Mutual Fire Insurance Company, 571 F.3d 299, 310 (3d Cir. 2009)(quoting New Hampshire v. Maine, 532 U.S. 742, 748-749, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968, 977 (2001)).

Under Pennsylvania law, issue preclusion applies if (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom issue preclusion is asserted was a party, or in privity with a party, in the prior case; (4) the party, or person in privy to the party, against whom issue preclusion is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.  Office of Disciplinary Counsel v. Kiesewetter, 585 Pa. 477, 484, 889 A.2d 47, 50-51 (2005); see also Prusky v. ReliaStar Life Insurance Company, 532 F.3d 252, 265 (3d Cir. 2008)(applying Pennsylvania law).

Here, the Commonwealth Court of Pennsylvania considered several legal arguments raised by the company plaintiff's in their state-court appeal.

Specifically, the Commonwealth Court considered whether the PPUC's conclusion that marginal line losses are generation costs, not transmission costs (and, thus, subject to the generation retail rate cap) violated the filed-rate doctrine and impermissibly trapped costs in violation of Nanatahala Power & Light Co. v. Thornburg, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). See Metropolitan Edison Company v. Pennsylvania Public Utility Commission, 22 A.3d at 364-366.

Additionally, the Commonwealth Court considered whether the PPUC's conclusion that marginal line losses are generation costs, not transmission costs was in conflict with (and thus preempted by) federal law, including FERC decisions and regulations, and Nantahala, supra. See 22 A.3d at 364-366.

In affirming the PPUC March 3, 2010 Opinion and Order, the Commonwealth Court concluded that the PPUC March 3, 2010 Opinion and Order did not violate the filed-rate doctrine and did not impermissibly trap transmission costs as prohibited by federal law. 22 A.3d at 366. Moreover, the Commonwealth Court concluded that the PPUC March 3, 2010 Order and Opinion was not in conflict with, and thus would not be preempted by, FERC's precedent established under the Federal Power Act. Id.

The second requirement for preclusion to apply under Pennsylvania law is that the prior determination is a final judgment on the merits. Commonwealth of Pennsylvania,

-31-

Department of Environmental Protection v. Fiore, 682 A.2d 860, 862 (Pa.Commw. 1996).  A judgment is final "unless or until it is reversed on appeal."  Shaffer v. Smith, 543 Pa. 526, 530, 673 A.2d 872, 874 (1996).

Here, as noted above, the Commonwealth Court's June 14, 2011 ruling was not disturbed on appeal to the Supreme Court of Pennsylvania or the United States Supreme Court. Accordingly, it represents a final determination on the merits for preclusion purposes.

The third requirement for issue preclusion to apply under Pennsylvania law is that the party against whom preclusion is asserted was a party, or in privity with a party, in the prior case.  Kiesewetter, 585 Pa. at 484, 889 A.2d at 50-51.

Here, this third requirement is satisfied because the company plaintiffs' were parties in both the PPUC proceedings and the Commonwealth Court appeal.

The fourth requirement for issue preclusion to apply under Pennsylvania law is that the company plaintiffs -- as the parties against whom preclusion is asserted -- had a full and fair opportunity to litigate the issues in the prior proceeding. Kiesewetter, 585 Pa. at 484, 889 A.2d at 50-51.

"A party has been denied a full and fair opportunity to litigate only when state procedures fall below the minimum requirements of due process as defined by federal law." Bradley

-32-

v. Pittsburgh Board of Education, 913 F.2d 1064, 1074 (3d Cir.
1990); see Minnick v. City of Duquesne, 65 Fed.Appx. 417, 423
(3d Cir. 2003).  This is an "admittedly general standard".
Minnick, 65 Fed.Appx. at 423.  "The core of due process is the
right to notice and a meaningful opportunity to be heard."
LaChance v. Erickson, 522 U.S. 262, 266, 118 S.Ct. 753, 756,
139 L.Ed.2d 695, 700 (1998); Stevenson v. Carroll, 495 F.3d 62,
69 (3d Cir. 2007).[62]

        In the underlying state-court proceedings, the company
plaintiffs' (petitioners before the Commonwealth Court) filed a
brief and reply brief in support of their appeal from the PPUC
March 3, 2010 Opinion and Order, and presented oral argument to
the Commonwealth Court en banc.  As demonstrated by the June 14,
2011 Opinion of the Commonwealth Court, the company plaintiffs'
were afforded a full and fair opportunity to litigate the filed-
rate doctrine, trapped cost, and preemption issues described
above.

---

[62]        Elements of due process include whether there is

        (1) notice of the basis of the governmental action; (2) a neutral
        arbiter; (3) an opportunity to make an oral presentation; (4) a
        means of presenting evidence; (5) an opportunity to cross-examine
        witnesses or to respond to written evidence; (6) the right to be
        represented by counsel; and (7) a decision based on the record
        with a statement of reasons for the result.

Rogin v. Bensalem Township, 616 F.2d 680, 694 (3d Cir. 1980); see Di Loreto
v. Costigan, 600 F.Supp.2d 671, 698 (E.D.Pa. 2009)(Buckwalter, S.J.).

The company plaintiffs contend that the Commonwealth Court's ruling is not entitled to preclusive effect because the Commonwealth Court held the company plaintiffs to a heavier burden than they face on their claims in this federal action. Specifically, the company plaintiffs contend that the Commonwealth Court did not examine federal preemption as a matter of law, but rather treated it as a question of fact and gave undue deference to the PPUC's factual findings.[63]  However, review of its decision demonstrates that the Commonwealth Court addressed the filed-rate, trapped-cost, and preemption issues as questions of law, not questions of fact.

The plaintiff companies are correct that the Commonwealth Court considered whether the PPUC's findings of fact were supported by substantial evidence and acknowledged that it would defer to such factual findings if they were so supported.  See 22 A.3d at 358-359.  Moreover, the company plaintiffs are correct that the Commonwealth Court concluded that there was substantial evidence to support the PPUC's factual determinations.  See 22 A.3d at 358-359.

The Commonwealth Court found that there was substantial evidence to support the factual determination that, historically, line losses were considered and treated as generation-related costs and subject to the generation retail

---

[63]        Plaintiffs' Brief at pages 28-29.

rate cap, and that, physically, line losses result in the need for additional energy to be generated for the purpose of covering those losses.  22 A.3d at 360-362.

However, the Commonwealth Court separated its consideration of whether the PPUC's factual determinations were supported by substantial evidence from its consideration of whether, as a matter of law, the PPUC March 3, 2010 Opinion and Order violated the filed-rate doctrine by impermissibly trapping transmission costs or was otherwise preempted by federal law. See id. at 358-362 (substantial evidence discussion), and 364-366 (filed-rate doctrine and preemption discussion).

"State courts may answer federal questions... [and][e]rror in a prior [state-court] judgment is not a sufficient ground for refusing to give it preclusive effect." Delaware River Port Authority v. FOP, Penn-Jersey Lodge 30, 290 F.3d 567, 576 (3d Cir. 2002)(hereinafter, "FOP Lodge 30"). In FOP Lodge 30, where the parties litigated an issue of federal law in New Jersey state court, the Third Circuit explained that "if the state court answered federal questions erroneously, it remained for state appellate courts, and ultimately for the United States Supreme Court, to correct any mistakes." FOP Lodge 30, 290 F.3d at 576.[64]

---

[64]         As noted above, the company plaintiffs were the parties who raised the filed-rate doctrine and federal preemption in the Commonwealth
(Footnote 64 continued):

Here, as explained above, the company plaintiffs presented legal argument to the Commonwealth Court concerning the PPUC's purported violation of the filed-rate doctrine and federal preemption of the PPUC's determination that marginal line losses are generation, rather than transmission, costs. Moreover, it is clear -- both from their claims in this action, and the direct appeals they sought from the Supreme Court of Pennsylvania and the United States Supreme Court -- that the company plaintiffs contend that the Commonwealth Court erred in its ruling with respect to the company plaintiffs' filed-rate doctrine, impermissible cost-trapping, and federal preemption arguments.

However, even assuming, for the sake of argument, that the Commonwealth Court erred in answering the federal questions concerning the filed-rate doctrine, impermissible rate-trapping, and federal preemption, "it remained for [the] state appellate courts, and ultimately for the United States Supreme Court, to correct any mistakes." FOP Lodge 30, 290 F.3d at 576.

_____

(Continuation of footnote 64):

Court.  I do not interpret the company plaintiffs to be advancing the argument that the Commonwealth Court was not entitled to answer the legal questions which the company plaintiffs presented to it -- an argument which would be wholly inconsistent with their having raised those issues before the Commonwealth Court.  Moreover, I note that in Nantahala, the United States Supreme Court cited state-court decisions which considered the filed-rate doctrine and did not, in any way, suggest that consideration of the filed-rate doctrine by the state courts was inappropriate or forbidden.  Nantahala, 476 U.S. at 964-966, 106 S.Ct. at 2356, 90 L.Ed.2d at 953-954.

Here, the company plaintiffs sought to correct in the Supreme Court of Pennsylvania and the United States Supreme Court what they contend was legal error by the Commonwealth Court.  Accordingly, it is not for this court to correct a legal error in the Commonwealth's Courts' resolution of the filed-rate doctrine, impermissible rate-trapping, and federal preemption issues raised there by the company plaintiffs, if there were any error.

The fifth, and final, requirement for issue preclusion to apply under Pennsylvania law is that the determination in the prior proceeding was essential to the judgment.  Kiesewetter, 585 Pa. at 484, 889 A.2d at 50-51.

Here, the fifth requirement is satisfied.  If the Commonwealth Court had determined that the PPUC March 3, 2010 Opinion and Order violated filed-rate doctrine, impermissibly trapped transmission costs, or was preempted by federal law, it would not have affirmed the March 3, 2010 Opinion and Order.

For the reasons expressed above, each of the necessary requirements for the application of issue preclusion under Pennsylvania law is satisfied with respect to whether the PPUC March 3, 2010 Opinion and Order violates the filed-rate doctrine, impermissibly traps transmission costs, or is preempted by federal law.

Accordingly, I now address the impact of those legal issues -- ruled upon by the Commonwealth Court -- on the claims asserted by the company plaintiffs.  For the reasons explained below, I conclude that the Commonwealth Court rulings on these legal issues preclude each of the company plaintiffs' claims.

In Count I of the Amended Complaint, the company plaintiffs aver that, pursuant to the filed-rate doctrine ("established by the FPA and the Supremacy Clause of the United States Constitution"), they are entitled to recover marginal transmission line loss costs charged to the companies by PJM through the retail rates which the companies charge their respective customers.[65]  The company plaintiffs allege that the PPUC March 3, 2010 Opinion and Order violates the filed-rate doctrine (and, in turn, the Federal Power Act and the Supremacy Clause of the United States Constitution) by impermissibly trapping transmission costs charged by PJM.[66]

Similarly, in Count II of the Amended Complaint, the company plaintiffs allege that the PPUC March 3, 2010 Opinion and Order violates the Federal Power Act and the Due Process Clause of the Fourteenth Amendment to the United States Constitution by depriving the company plaintiffs of the right to recover the costs of marginal transmission line losses charged

---

[65]        Amended Complaint at ¶¶ 52, 55.

[66]        Id. at ¶ 56.

by PJM.  In other words, the alleged property-right deprivation upon which the claim in Count II rests is the purported illegal impermissibly trapped costs charged to the companies by PJM caused by the PPUC March 3, 2010 Opinion and Order.

Finally, in Count III of the Amended Complaint, the company plaintiffs allege that Pennsylvania's Electric Competition Act as applied to the company plaintiffs in the PPUC March 3, 2010 Opinion and Order is preempted by federal law, specifically the Federal Power Act of 1935, 16 U.S.C. §§ 791-828c, and more specifically, the filed-rate doctrine.[67]

Plaintiffs' claims in Counts I, II, and III of the Amended Complaint expressly assert, or are premised upon, the filed-rate doctrine, cost-trapping, and federal preemption arguments which the company plaintiffs raised and litigated before the Commonwealth Court.  The Commonwealth Court ruled against the parties on those issues and, as described above, plaintiffs are precluded from re-litigating those issues here. Accordingly, I grant the PPUC defendants' within motion and dismiss plaintiffs' Amended Complaint.

<u>Nature of the Underlying Proceedings</u>

The company plaintiffs contend that the PPUC March 3, 2010 Opinion and Order and the Commonwealth Court June 14, 2011 Opinion do not have any preclusive effect upon this action

---

[67]         Amended Complaint at ¶ 64.

because the state proceedings which produced those two decisions were legislative, rather than judicial, in nature.[68]  Specifically, with respect to the Commonwealth Court decision, the company plaintiffs contend that court proceedings on judicial review of ratemaking orders are legislative in character.

The PPUC defendants contend that both the PPUC and the Commonwealth Court decision were judicial or quasi-judicial in nature and, thus, entitled to preclusive effect if the other requirements for preclusion are satisfied.[69]

Whether or not the PPUC and Commonwealth Court proceedings are legislative or judicial in nature is determined by the characterization of those proceedings under Pennsylvania law.  See Oklahoma Packing Co. v. Oklahoma Gas & Electric Co., 309 U.S. 4, 7-8, 60 S.Ct. 215, 84 L.Ed. 537 (1940).

As the company plaintiffs correctly note, the Superior Court of Pennsylvania has stated that "[r]ate making is an exercise of the legislative power, delegated to the [Public Utility] Commission, and necessarily implies a range of legislative discretion." Duquesne Light Company v. Pennsylvania Public Utility Commission, 176 Pa.Super. 568, 590, 107 A.2d 745, 755 (1954).  However, the company plaintiffs also note that

---

[68]     Plaintiff's Brief at pages 23-27; Plaintiffs' Sur-Reply Brief at pages 10-13.

[69]     Defendants' Reply Brief at pages 8-12.

Pennsylvania courts have not expressly addressed the question of whether Commonwealth Court appellate review of a PPUC Order is a legislative or judicial act.[70]

Nonetheless, the company plaintiffs contend that Pennsylvania regards appellate court review of PPUC orders as an extension of the legislative process.[71]  For this proposition, the plaintiffs rely upon Pennsylvania State Chamber of Commerce v. Torquato, 386 Pa. 306, 322, 125 A.2d 755, 763 (1956), quoting Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 773, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947), in turn quoting Oklahoma Natural Gas Company v. Russell, 261 U.S. 290, 291, 43 S.Ct. 353, 67 L.Ed. 659 (1923).

Although the phrase "state courts 'acting in a legislative capacity'" does appear in Torquato, the Supreme Court of Pennsylvania in Torquato, cited Hirsch (and, in turn, Russell) in the context of addressing a question not presented here, namely: whether a statutory provision in Pennsylvania's Unemployment Compensation Law which required payment of unemployment compensation by an employer prior to judicial review of the award issued by an unemployment compensation referee, or prior to review by the Unemployment Compensation

---

[70]        Plaintiffs' Brief at page 25.

[71]        Id.

-41-

Board of Review, violated the employer's procedural due process rights.  See Torquato, 386 Pa. at 321, 326-327, 125 A.2d at 762, 765.

Moreover, the court in Torquato quoted the phrase "acting in a legislative capacity" from the United States Supreme Court in Russell, supra, a case in which the Supreme Court expressly noted that Oklahoma law, specifically, the state constitution, "gives an appeal to the Supreme Court of the State, *acting in a legislative capacity*" from a rate order issued by the state's Corporation Commission.  Russell, 261 U.S. at 291, 43 S.Ct. at 353, 67 L.Ed. at 661.

Here, plaintiffs have not provided, and the court has not located, a constitutional or statutory provision, or judicial opinion in Pennsylvania expressly providing that the Commonwealth Court of Pennsylvania is acting in a legislative capacity when reviewing on appeal orders issued by the PPUC.

The briefs of both parties note the differentiation between legislative and judicial action provided by the United States Supreme Court in New Orleans Public Service, Inc. v. Council of the City of New Orleans, 91 U.S. 350, 370-371, 109 S.Ct. 2506, 2519-2520, 105 L.Ed.2d 298, 318-319 (1989) ("NOPSI")(quoting Prentis v. Atlantic Coast Line Company,

211 U.S. 210, 226-227, 29 S.Ct. 67, 69-70, 53 L.Ed. 150, 158-159

(1908)(Holmes, J.)).[72]  In NOPSI, the Court stated:

> A judicial inquiry investigates, declares and enforces
> liabilities as they stand on present or past facts and
> under laws supposed already to exist.  That is its
> purpose and end.  Legislation on the other hand looks
> to the future and changes existing conditions by
> making a new rule to be applied thereafter to all or
> some part of those subject to its power.  The
> establishment of a rate is the making of a rule for
> the future, and therefore is an act legislative and
> not judicial in kind....

NOPSI, 91 U.S. at 370-371, 109 S.Ct. at 2519-2520, 105 L.Ed.2d

at 318-319 (quoting Prentis, supra)(omissions in the original

and internal quotations omitted).  According to the Supreme

Court, the proper characterization of an action

> depends not upon the character of the body but upon
> the character of the proceedings....  And it does not
> matter what inquiries may have been made as a
> preliminary to the legislative act.  Most legislation
> is preceded by hearings and investigations.  But the
> effect of the inquiry, and of the decision upon it, is
> determined by the nature of the act to which the
> inquiry and decision lead up....  The nature of the
> final act determines the nature of the previous
> inquiry.  As the judge is bound to declare the law he
> must know or discover the facts that establish the
> law.  So when the final act is legislative the
> decision which induces it cannot be judicial in the
> practical sense, although the questions considered
> might be the same that would arise in the trial of a
> case.

NOPSI, 91 U.S. at 371, 109 S.Ct. at 2520, 105 L.Ed.2d at 319

(quoting Prentis, supra)(omissions in the original).

---

[72]        Plaintiffs' Brief at pages 23-25; Defendants' Reply Brief at
pages 10-12.

Here, examination of the Commonwealth Court's inquiry concerning the PPUC March 3, 2010 Opinion and Order demonstrates that it was judicial in nature, and thus is afforded preclusive effect.

Under Pennsylvania law, "[a]ppellate review of a [Public Utility Commission] order is limited to determining whether a constitutional violation, an error of law, or a violation of PUC procedure has occurred and whether necessary findings of fact are supported by substantial evidence." Popowsky v. Pennsylvania Public Utility Commission, 589 Pa. 605, 622, 910 A.2d 38, 48 (2006).

The Commonwealth Court of Pennsylvania did not conduct an independent, forward-looking factual investigation in order to determine the reasonableness of the PPUC March 3, 2010 Opinion and Order as a rule to be applied going forward. Rather, the Commonwealth Court relied upon past facts (as found in the proceeding before the PPUC) and existing law (as the Commonwealth Court interpreted it) to resolve a challenge to the legality of a prior action (the PPUC March 3, 2010 Opinion and Order).

Accordingly, I conclude that the Commonwealth Court review of the PPUC March 3, 2010 Opinion and Order was judicial, not legislative, in nature.  Therefore, the nature of the

Commonwealth Court's action does not deprive it of preclusive effect.

## **Alternate Grounds for Dismissal**

As noted in the Summary of Decision above, the PPUC defendants asserted claim preclusion, <u>Burford</u> abstention, and judicial estoppel as alternate grounds for dismissal of the company plaintiffs' claims.  Because I concluded, for the reasons expressed above, that the Amended Complaint should be dismissed on issue preclusion grounds, I do not reach the alternate grounds raised in the Amended Motion to Dismiss.

## **CONCLUSION**

For all of the foregoing reasons, I grant the Amended Motion to Dismiss and dismiss plaintiffs' Amended Complaint.